WALTHAM WATCH COMPANY et al., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 13858.

United States Court of Appeals Seventh Circuit.

June 5, 1963.

J. B. Truly, Asst. Gen. Counsel, John Gordon Underwood, Atty., James McI. Henderson, Gen. Counsel, Frederick H. Mayer, Atty., F. T. C., for respondent.

Before DUFFY and KILEY, Circuit Judges, and PLATT, District Judge.

DUFFY, Circuit Judge.

This is a petition for the review of an order issued by the Federal Trade Commission after an administrative proceeding on a complaint which charged petitioners with unfair and deceptive acts and practices and unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act.

The complaint charged David Singer, trading as Time Industries and Muriel Singer, his wife, individually, with false and deceptive advertising relative to the distribution of clocks which were imported from West Germany and carried the name "Waltham" on the face or dial of the clock.

The Waltham Watch Company, Harry Aronson and Lawrence Aronson, individually, and as officers of the corporation, were charged with placing the means and instrumentalities in the hands of David Singer and Muriel Singer whereby distributors and the public may be misled as to the origin and manufacture of the "Waltham" clocks.

After a hearing, the Examiner found the allegations of the complaint were fully sustained by the evidence. The order prohibits the Singers, Waltham Watch Company, Harry Aronson, individually and as an officer of the Company, and Lawrence Aronson as an officer of the Company, from engaging in the practices challenged in the complaint.

Upon petition for review filed by Waltham Watch Company, Harry and Lawrence Aronson as officers of the Company, and Harry Aronson, individually, the Commission affirmed in every respect the Examiner's initial decision and order and adopted them as its own.

Seymour Rady, Chicago, Ill., B. Paul Noble, Washington, D. C. (Hughes & Noble, Washington, D. C., of counsel), for petitioners.

The well-known Waltham Watch Company was located at Waltham, Massachusetts. It was founded in 1849 and

became a widely known manufacturer of watches and clocks. Some time prior to July 1957, Waltham Watch Company ceased the manufacture of watches. It had discontinued the manufacture of clocks some years previously.

In July 1957, the Waltham Watch Company of Delaware was organized as the result of a "spin-off" of the original Waltham Watch Company. The location of the new Waltham Watch Company is Chicago, Illinois. The name of the old Company was changed to Waltham Precision Instrument Company. The newly organized Delaware corporation which is the petitioner herein, acquired from the old Massachusetts corporation, trademarks, good will and the trade name "Waltham." No inventory of watches was included because the latter had been transferred to Hallmark, Inc. under a 1956 license agreement between Hallmark and the original Massachusetts corporation. There was no inventory as to clocks because the old Massachusetts corporation had ceased manufacturing clocks a number of years previously. At no time since its organization in 1957 did the new Waltham Watch Company manufacture any watches or clocks. Whatever watches or clocks were sold by the new company were imported from European countries.

In 1959, the Waltham Watch Company, a Delaware corporation, was merged with Hallmark. Petitioner Harry Aronson was then president, and petitioner Lawrence Aronson was treasurer of Hallmark. Upon completion of the merger, Harry Aronson was elected president and Lawrence Aronson, vice president of the Delaware corporation, which thereafter continued to conduct its business under the name of "Waltham Watch Company."

In March 1958, about one year prior to the merger with Hallmark, Waltham Watch Company, the Delaware corporation, entered an agreement with David Singer trading as Time Industries. The latter was licensed to use the name "Waltham" in connection with the distribution and sale of clocks. The agreement provided that all advertising and promotional material must receive the prior written approval of Waltham Watch Company before being released for publication.

The clocks sold by Time Industries under the agreement, were imported by Waltham Clock Company from Germany. When Waltham and Hallmark merged, the agreement with Time Industries was continued by letter dated February 26, 1959. This letter was signed for Waltham by Harry Aronson, president. However, the working agreement was changed to the extent that Time Industries imported the clocks instead of Waltham.

On September 1, 1959, Singer, trading as Time Industries, entered into a formal licensing agreement with Waltham by which Singer was authorized to import clocks bearing the name "Waltham." A royalty of fifty cents per clock was to be paid to Waltham. A minimum annual royalty of $50,000 was, by the agreement, payable from Singer to Waltham.

Time Industries advertised in national magazines, periodicals and newspapers, and offered members of the public an opportunity to become franchised distributors of Waltham clocks. We set forth extracts from typical advertisements circulated by Time Industries:

"FAMOUS 109–YEAR FIRM ANNOUNCES NEW EXPANSION FRANCHISE PLAN

"World Renowned

WALTHAM CLOCKS

"Millions buy this great brand

"You know WALTHAM is one of the four great names in watch making. Your grandfather did, too. WALTHAM, a great American name, backed by old world craftsmanship, for the design and styling of its clocks. * * * "

"When you become the WALTHAM Franchise Man in your town you've got a world famous name working for you, day and night, seven days a week."

"WALTHAM WATCH COMPANY invites you to participate in one of the most gigantic expansion programs ever launched. * * * "

"WALTHAM CLOCKS

"Product of WALTHAM WATCH COMPANY since 1850. For the first time in the history of direct selling a famous 150-year-old company with established national brand products offers you this opportunity."

The advertisements above quoted, and others of a like nature, were knowingly false and misleading. The "famous 109-year firm" and the "famous 150-year-old company" referred to the original Waltham Watch Company which had been located at Waltham, Massachusetts, but that company had nothing to do with the proposed sale of Waltham clocks. The advertisements were cunningly devised to deceive. The testimony shows that many persons who paid money to the Singers for the privilege of selling "Waltham" clocks, were deceived by the advertisements and by the statement of Waltham representatives who called upon them. Many of these representatives displayed business cards to the prospective distributors. The words in largest print on these cards were "Waltham Watch Company." In slightly smaller print were the words "Manufacturers since 1850."

The final order of the Federal Trade Commission which adopted the Examiner's order insofar as it affects the petitioners herein, ordered the petitioners to cease and desist from using or authorizing any person to use the name of "Waltham" in connection with the sale of clocks or other products unless the public is clearly warned by a statement immediately in connection therewith that the product is not manufactured by the Waltham Watch Company of Waltham, Massachusetts.

The order further provided that if the product is of foreign origin, the country of origin be clearly and conspicuously disclosed on the product and on the advertising used in offering it for sale.

The order also required petitioners to cease and desist from "Placing any means or instrumentality in the hands of others whereby they may mislead the public, as to the manufacturer or any product which they sell, the manufacturer's age, experience and reputation or the country of origin of the product."

Petitioners argue that they should not be penalized and restricted because the licensing agreement with Singer contained a provision that all advertising and promotional material used by Singer was first to be presented and approved by Waltham before being used. But the record clearly indicates that officers of Waltham did receive and know about many complaints of misrepresentation. Mrs. Singer testified that proposed advertising was mailed to Waltham at various times. She testified, "If we didn't receive word back, we just went ahead with the advertising; we took it for granted that it was all right."

 Certain it is, petitioners could not sit back and ignore the complaints pertaining to the acts of their licensee. Petitioners had placed in the hands of others the means and instrumentalities whereby many people had been hoodwinked, defrauded and misled. They must accept the responsibility for so doing.

Petitioners argue that they expeditiously cancelled the license with Singer. However, we do not regard a cancellation made more than two months after the complaint herein was filed, as acting in an expeditious manner. Plaintiffs knew of the complaints many months earlier but did nothing to stop the false representations until they figuratively felt the Federal Trade Commission breathing down their necks. Also, by the time of cancellation, Singer had fallen in arrears on his royalty payments.

 The pertinent principles of law are clear. The owner of a trademark or tradename may not use, nor permit the use of, such trademark or tradename in

a manner designed to deceive the public. Federal Trade Commission v. Winsted Hosiery Company, 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729; Edward P. Paul & Company, Inc. v. Federal Trade Commission, 83 U.S.App.D.C. 232, 169 F.2d 294, 295–296. Those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act. R. B. James and Patrick Zusla, Individuals and Co-partners, Trading as Chicago Board Company v. Federal Trade Commission, 7 Cir., 253 F.2d 78, 80; International Art Company v. Federal Trade Commission, et al., 7 Cir., 109 F.2d 393, 396.

■■■ There may be some basis for an argument that the form and scope of the order should be changed. However, we should keep in mind the well-established general principle that the Commission may require affirmative disclosure for the purpose of preventing future deception, and the Commission may fashion orders broad enough to close all roads to the prohibited goal. Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081; L. Heller & Son, Inc., et al. v. Federal Trade Commission, 7 Cir., 191 F.2d 954, 956.

In Federal Trade Commission v. Ruberoid Co., supra, the main attack was on the breadth of the order. The Supreme Court stated, 343 U.S. at page 473, 72 S.Ct. at page 803: "In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity. Moreover, '[t]he Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices' disclosed. * * * Congress placed the primary responsibility for fashioning such orders upon the Commission, and Congress expected the Commission to exercise a special competence in formulating remedies to deal with problems in the general sphere of competitive practices. Therefore we have said that 'the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.'"

Although if we were fashioning the remedy, we might have done so in some respects differently from that of the Commission, yet, as the function is primarily that of the Commission, we will approve the order as the Commission prepared it.

Affirmed.